Strafford
No. 86-239

THE STATE OF NEW HAMPSHIRE

v.

JERRY L. MURRAY

August 11, 1987

*Stephen E. Merrill*, attorney general (*Kathleen A. McGuire*, assistant attorney general, on the brief and orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

SOUTER, J. In this appeal from his class B felony arson conviction, see RSA 634:1, III, the defendant argues that the Superior Court (*Nadeau*, J.) erred in failing to dismiss the indictment, either as a remedy for the destruction of material evidence or because of the insufficiency of the evidence to prove guilt. We affirm.

At all relevant times Arlene and Jeffrey Foster owned real estate in New Durham, on which, prior to September, 1983, there stood a vacant house and barn, known as Hill Farm. From the evidence at the defendant's trial the jury could have found that Clarence and Barbara Jenness drove past Hill Farm between 5:30 and 6:00 p.m. on August 21, 1983, and saw a green car parked in the driveway, with a man sitting at the wheel. Paul Moulton also drove by shortly before 6:00 p.m. and noticed a man, whom he later described and identified as the defendant, walking from the direction of the barn toward a dark green Chevrolet parked in the yard.

At 7:40 p.m. that evening, a neighbor reported that the farm was burning. The barn was in flames and had partially collapsed when the fire chief arrived, and the fire was spreading through the ell of the house. The flames were put out before destroying all of the house, however, and later in the evening two investigators from the State fire marshal's office inspected what remained. They agreed with each other that the physical evidence pointed to the south side of the barn as the fire's point of origin. Upon learning that no electric power was being supplied to the farm at the time of the fire, they ruled out wiring as a cause; they also eliminated heating devices because the place was unoccupied. One of the investigators later testified that he ruled out lightning, because there were no storms, as well as the possibility of a discarded cigarette, because of the description of the fire when first sighted. Each investigator stated that the cause was not spontaneous combustion, given the owners' description of the materials at the buildings and the investigator's own observations at the scene. Each concluded that someone had deliberately started the fire, and on the basis of physical evidence one of them set the time at 5:49 p.m.

On the basis of Moulton's identification and description, the defendant was arrested the next day and charged with the arson. He first admitted he had driven over the road past the farm the day before, and said he knew of the fire because he had gone by the site on the morning of his arrest. When one of the fire investigators indicated there was reason to believe the defendant had spoken with a police cadet at the scene the night before, the defendant admitted he had driven to the fire and had asked a police

officer what was going on. He then also admitted that he had stopped at the farm for two or three minutes between 5:45 and 6:00 p.m. the evening before, and had left his car to relieve himself behind the barn. He first insisted that he had parked two or three hundred feet up the road from the buildings, but later changed his story and claimed he parked alongside the driveway. He said he had pulled into the property by the side of the driveway, but continued to deny he had parked in the yard. When the police asked if he might have started the fire accidentally, he said he did not remember whether he had been smoking at the time, and conceded that he might have dropped a cigarette.

Some two weeks after the fire, one of the owners, Arlene Foster, contracted to have the remains of the buildings torn down. At trial, she testified that she thought she told the police and fire inspectors of her plans, although she did not specifically remember doing so. The contractor who did the demolition work testified that the surviving portions of the structures were unsafe to go upon, and had been razed out of concern that pilferers would enter them and be injured. He estimated that it would have cost at least ten thousand dollars to fence off the site effectively.

This destruction of the buildings prompts the defendant's first argument on appeal, that he was deprived of due process, as measured by the State and National Constitutions, in being forced to stand trial without the opportunity to subject the physical remains of the burned buildings to an examination by an expert of his own choosing. He cites part I, article 15 of the Constitution of New Hampshire and the fourth and fourteenth amendments of the National Constitution, and maintains that the only adequate remedy for the constitutional deprivation is dismissal of the indictment against him. We will consider the State claim first. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983); *see also Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

Although we have begun to develop a body of State law dealing with the interests affected by the government's loss or destruction of relevant evidence, *see State v. Baillargeon*, 127 N.H. 782, 508 A.2d 1051 (1986); *State v. Dukette*, 127 N.H. 540, 545–46, 506 A.2d 699, 704–05 (1986), we have had no prior occasion to consider the constitutional significance of destruction by a third party. This, however, is not the case to examine that novel question. For in spite of the fact that it was the building's owner, not the State, who caused the destruction of the evidence in question, the State has briefed the issues on the basis of our existing law as developed in *Dukette* and *Baillargeon*.

■■ Under the standards derived in these recent cases, once a defendant demonstrates that the State has lost or destroyed apparently relevant evidence, the State has the burden to demonstrate that it acted both with good faith, in the sense that it was free of any intent to prejudice the defendant, and without culpable negligence. *State v. Dukette, supra* at 545–46, 506 A.2d at 704. If the State carries that burden, the defendant may not claim any relief unless he demonstrates that the lost evidence was material, to the degree that its introduction would probably have led to a verdict of not guilty, and that its loss prejudiced him by precluding the introduction of evidence that would probably have led to a verdict in his favor. *Id.* at 546, 506 A.2d at 704.

Taking these matters in order, the relevance of the lost evidence is not in issue, and we may look immediately to the State's intentions and responsibility. Although the present case was tried before the decision in *Dukette*, the trial judge anticipated the required inquiry into the State's good faith and freedom from culpability when he concluded, after hearing, that "[i]t's just not clear to me that the State was responsible for the destruction." And while this statement may suggest that the trial court burdened the defendant with an obligation to prove bad faith or negligence, the issue need not be reheard, because the evidentiary record would not reasonably support any other conclusion than good faith and freedom from culpable neglect. A brief summary of the evidence will indicate why this is so.

There is no evidence that anyone besides the owner participated in her decision to level the damaged buildings. She acted out of fear that trespassers would be injured, a concern that was equally justifiable, whether it proceeded from altruism or from apprehension that under existing New Hampshire law she could be held liable for a trespasser's injuries. *See Ouellette v. Blanchard*, 116 N.H. 552, 557, 364 A.2d 632, 634 (1976). There is no suggestion that the owner had reason to believe the defendant would suffer any disadvantage from the buildings' destruction, and there is no basis to argue that she should reasonably have considered spending ten thousand dollars to fence the ruin. Nothing but good faith and reasonable care may, therefore, be found on the owner's part. Even if there were some reason, then, to impute the owner's actions to the State, the imputation would carry nothing detrimental.

Turning to the conduct of the State's agents, the defendant does not argue that the apparent absence of a formal police policy governing the preservation of evidence should affect the outcome of the judicial considerations of good faith and culpable neglect. *Cf.*

*United States v. Bryant,* 439 F.2d 642, 652 (D.C. Cir. 1971). We therefore look to the record of evidence relating specifically to what the State's agents knew or did, and we find in that record no suggestion of ill motive or blameworthy neglect. At most, the trial court could have inferred that police and fire officials knew of the owner's plans. On the evidence, there is reason to suppose that the prosecutor did not know, and, as the following discussion on materiality will indicate, there was nothing to suggest that in demolishing the buildings any exculpatory evidence would be lost. The worst that can be said of the State's actions is that its agents in the field took no steps to prevent the owner from destroying property having no apparent exculpatory value to the defendant. The only reasonable inferences are that no disadvantage to the defendant was probable and that no one representing the State intended to cause prejudice. That is, the State's good faith and freedom from culpability are the only conclusions consistent with this record.

The burden consequently falls on the defendant to demonstrate materiality and prejudice before he may demand any relief, let alone dismissal of the indictment. The record gives the defendant no chance of carrying those burdens. Looking, first, to the possible materiality of what was lost, we can sharpen the inquiry by concentrating on what the defendant told the trial court. He argued that access to the burned building might have been valuable as a source of evidence to dispute the conclusions of the State's experts that the fire was not a result of spontaneous combustion, but was set. Given this position, the ruins could have provided material evidence to the defense only if their condition would have revealed something to create a reasonable doubt that the fire had been deliberately started. Suffice it to say that nothing in the record even hints that the charred remains, if preserved, would have yielded any evidence of such probative force.

The defendant's position appears even more hopeless when we realize that the State's experts did not rest their opinions about the origin of the fire entirely on observations of the burned remains. Lightning, wiring and heating devices were apparently ruled out on the basis of other information. And while the elimination of spontaneous combustion rested in part on observations, the experts also relied on information supplied by the owners. Thus the condition of the charring could have revealed material evidence only if it could have refuted a line of reasoning that rested to a significant degree on information provided by the building's owners and other witnesses.

What we have said about the materiality of the lost evidence indicates that the defendant's burden to prove prejudice is equally doomed on this record. While we will assume that the notes and photographs prepared by the State's experts were not adequate alternatives to an independent inspection of the buildings' remains, it would be sheer speculation to suggest that the defendant would have been better off at trial if the buildings had not been destroyed.

■ We conclude, therefore, that the record will not support any finding of a due process violation when judged under *Dukette*, and it is equally certain that the defendant fares no better under federal standards. Although the federal approach as enunciated in *United States v. Picariello*, 568 F.2d 222, 227–28 (1st Cir. 1978), is slightly different from our own, in treating good faith, materiality and prejudice as factors in a balancing analysis, there is no reason to regard the federal standard as more favorable to the defendant in practice. Indeed, the State rule arguably gives him an advantage, in its recognition that the State has a burden to prove freedom from culpable negligence as well as good faith.

■ We turn now to the defendant's second claim on appeal, that the indictment should have been dismissed because the evidence was insufficient to prove guilt. Under the familiar standards that we apply, the defendant has the burden to demonstrate that no rational trier of fact, viewing the evidence most favorably to the State, could have found guilt beyond a reasonable doubt. *State v. Smith*, 127 N.H. 433, 436, 503 A.2d 774, 776 (1985). The rational trier is, of course, entitled to infer guilt from circumstantial evidence that excludes all other rational conclusions. *State v. Danskin*, 122 N.H. 817, 818, 451 A.2d 396, 397 (1982).

The defendant argues that no evidence linked him to the fire "except his mere presence and his denial of an immaterial fact," but the record does not so favor him. An eyewitness described him as coming from the direction of the barn, where the fire originated, at about the time it probably started. He visited the scene again during the conflagration. His statements to the police were a series of retreats from initial deception. He first said that he had merely passed the farm on the day of the fire, and again the day afterward. When challenged, he admitted that he had gone to the fire and made an enquiry of a police officer. Then he admitted he had actually stopped at the farm before the fire, but claimed he had parked up the road from the buildings. Then he changed that story and said he had parked alongside the driveway. But even this final

version was contradicted by three witnesses who testified they had seen the car parked in the yard.

 Thus the evidence was that the defendant had repeatedly tried to deceive the police about highly material matters, and the jury could infer that the defendant would not have concocted a succession of lies if he had only urinated behind a barn. The only rational inference revealed a man who had botched his attempt to conceal responsibility for a fire, which had been set when he alone was present at the scene.

*Affirmed.*

All concurred.